UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| AETNA INC. and AETNA LIFE INSURANCE COMPANY,<br><br>  Plaintiffs,<br><br>v.<br><br>THE PEOPLE'S CHOICE HOSPITAL, LLC, *et al.*<br><br>  Defendants. | NO: SA:18-CV-00323-OLG |

**PLAINTIFFS' OPPOSED MOTION TO COMPEL THE
DEPOSITION OF DEFENDANT SETH GUTERMAN, M.D.
TO OCCUR IN THE UNITED STATES OF AMERICA**

**PRICHARD YOUNG LLP**
Union Square
10101 Reunion Place, Suite 600,
San Antonio, TX 78216
(210) 477-7400

**ELLIOTT GREENLEAF, P.C.**
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
Blue Bell, PA 19422-1956
(215) 977-1000

**MCGUIREWOODS LLP**
JPMorgan Chase Tower
600 Travis Street, Ste. 750
Houston, TX 77002
(832) 214-9942

*Counsel for Plaintiffs Aetna Inc. and Aetna Life Insurance Company*

Plaintiffs Aetna Inc. and Aetna Life Insurance Company (together, "Aetna"), by and through their undersigned counsel, respectfully move this Court for an order compelling Defendant Seth Guterman, M.D. to appear at his counsel's office in Chicago for a deposition on December 12, 2019. In support of Aetna's motion, Aetna avers as follows:

## PRELIMINARY STATEMENT

1. This case involves kickbacks, fraudulent billing, and a nationwide racketeering conspiracy that resulted in Defendants stealing more than $21 million from Aetna. Defendants secretly infiltrated a small, 25-bed rural hospital in Oklahoma ("Newman"), paid off physicians and others from around the country to send urine and blood samples to labs in Texas that were controlled by Defendants, and then knowingly submitted false bills to Aetna. Defendants used Newman as a front, misrepresenting that the illegally-obtained specimens were *sent to* and *tested by and at* Newman *for Newman's own patients*. None of this was true.

2. Defendant Seth Guterman, M.D. ("Guterman") was a primary architect of the scheme at Newman, and at other hospitals around the country. Guterman was, and remains, the CEO of Defendant PCH,[1] which is a Delaware hospital management company headquartered in Chicago, Illinois. Guterman initially implemented the scheme at a small rural hospital in Florida,[2] and then brought it to Newman. Indeed, he personally traveled to Shattuck, Oklahoma, misled Newman into allowing PCH to run the hospital, maintained a day-to-day role in

---

[1] "PCH" refers to The People's Choice Hospital, LLC, PCH Management Newman, LLC, PCH Lab Services, LLC.

[2] Defendants' scheme got its start at Campbellton-Graceville Hospital in Florida. There, PCH and Guterman used the hospital to steal more than $100 million, leaving it bankrupt. *See* HOW SOME RURAL HOSPITALS WERE USED TO SCORE HUGE PAYDAYS, https://www.cbsnews.com/news/how-some-rural-hospitals-were-used-to-score-huge-paydays/

overseeing the entire scheme, took millions, and then left Newman on the brink of bankruptcy when Aetna and others discovered the scheme. He is a central Defendant in this case.

3. Shortly after he was served with this lawsuit, however, Guterman—a U.S. citizen and, at that time, a resident of Chicago—left the country, moved to Israel, and allegedly obtained Israeli citizenship. Guterman nevertheless continues to conduct business in the United States. He remains the CEO of PCH, which is a Defendant in this case and still listed as an active Delaware limited liability company. And, Guterman recently created a new Delaware company called MSMC Management, LLC, in a failed effort to purchase a Chicago-area hospital.[3] Guterman may have physically left the country after Aetna served him, but he continues to reach into the United States regularly to conduct business.

4. Despite this, Guterman refuses to appear in the United States for his deposition in this matter until he returns for Passover in April (discovery closes in this case on April 15, 2020; Passover runs from April 8-16). If Aetna wants to depose him at any other time, Guterman's position is that the lawyers for all parties should travel to Israel for his deposition, or conduct a critical deposition via video link and with a seven-hour time zone difference.

5. This position is contrary to relevant case law and is nothing more than an attempt to avoid going under oath to answer for his misconduct at Newman. Guterman is subject to the jurisdiction of this Court, and he cannot dictate when he is deposed based on when he decides to re-enter the country. Guterman does not hesitate to use this Court and this country when he sees a benefit to himself, but he refuses to step foot in the country to answer for his conduct at Newman and other hospitals under oath. Therefore, Aetna seeks an order compelling Guterman to appear in Chicago at his counsel's office for deposition on December 12, 2019.

---

[3] *See* POTENTIAL BUYER SAYS METROSOUTH OWNER REFUSES TO NEGOTIATE, *available at* https://chicago.suntimes.com/business/2019/8/27/20835361/metrosouth-hospital-blue-island-potential-buyer-owner-refuses-negotiate.

## BACKGROUND FACTS

### I. Aetna's Allegations and Guterman's Direct Involvement

6. Newman is a small, 25-bed hospital in rural Oklahoma. In early 2016, when Newman was facing financial difficulties, Guterman traveled to Oklahoma and offered to operate Newman. PCH never intended to help Newman. Instead, PCH teamed up with the Labs[4] and its other co-conspirators, and used Newman as a vehicle to orchestrate a massive fraud centered on billing Aetna for lab tests as if the tests were completed by Newman on specimens drawn from Newman's patients, when in truth, they were not.

7. The Labs, for their part, participated in this scheme by paying off physicians and others throughout the country—none of whom had any legitimate relationship with Newman—to refer urine and blood samples from unwitting patients.

8. After using financial inducements to obtain specimens, Defendants knowingly submitted claim forms misrepresenting that these specimens were drawn from Newman patients for testing, and that Newman, not the Labs, performed the testing. Relying on these misrepresentations, Aetna issued payments at the high rates it had negotiated with Newman. Defendants concealed that the lab tests they billed for were performed elsewhere by the Labs for specimens gathered from non-patients of the hospital.

9. When Aetna began to suspect that Defendants were running an illegal scheme using Newman as a shell enterprise, Guterman, on behalf of the Defendants, sent correspondence to Aetna that included numerous, material misrepresentations. Guterman went so far as to send Aetna phony pictures of what Defendants falsely claimed to be Newman's lab.

---

[4] "Labs" refers to Mission Toxicology, LLC, Mission Toxicology II, LLC, Mission Toxicology Management Company, LLC, Sun Clinical Laboratory, LLC, Sun Ancillary Management, LLC, Integrity Ancillary Management, LLC, Alternate Health Labs, Inc., Alternate Health Corp., Michael L. Murphy, M.D., Lynn Murphy, Samantha Murphy, Julie Pricer, and Jesse Saucedo, Jr.

## II.    The Scheme Originated at a Small Rural Hospital in Florida

10.    Newman was not the first hospital at which Guterman implemented this scheme. The scheme originated at Campbellton-Graceville Hospital ("CGH") in Florida. PCH took over the management of CGH, and Guterman installed Jorge Perez as the CEO of CGH. Aetna believes that PCH affiliated with numerous independent labs in its "management" of CGH, including some of the Labs at issue here, and ran a scheme that was materially identical to the one PCH later ran at Newman.

11.    In total, public reporting suggests that PCH and its co-conspirators stole more than $100 million from the operations at CGH. PCH then moved the scheme to Newman, where Guterman again convinced a vulnerable hospital to open its doors and bank accounts to PCH. Just as he had with Jorge Perez at CGH, Guterman installed a PCH agent, David Wanger, as the acting CEO of Newman.

12.    While this was happening, numerous public reports surfaced about improper and potentially unlawful acts that had occurred at CGH, and at other hospitals affiliated with individuals and companies that had been part of the operation of CGH while PCH was the manager.[5] When PCH and its co-conspirators left CGH, it was forced into bankruptcy, leaving a remote, small town without access to critical medical care. *See supra* note 1. In recent months, the Department of Justice ("DOJ") has unsealed documents, including a plea arrangement and criminal information, relating to the operation of CGH and another rural hospital in Missouri.[6]

---

[5] *See e.g.*, JACKSON CO. OFFICIALS INVESTIATE FRAUD AT CAMPEBLLTON GRACEVILLE HOSPITAL, https://www.mypanhandle.com/news/jackson-co-officials-investigate-fraud-at-campbellton-graceville-hospital; COURT FREEZES MANAGER FROM CAMPBELLTON-GRACEVILLE HOSPITAL BANK ACCOUNTS, https://www.dothaneagle.com/archives/court-freezes-manager-from-campbellton-graceville-hospital-bank-accounts/article_03a4c853-8007-593b-8d68-5386c83450df.html.

[6] THE UNITED STATES DOJ, SUBSTANCE ABUSE TREATMENT CENTER OWNER PLEADS GUILTY TO $57 MILLION MONEY LAUNDERING CONSPIRACY IN CONNECTION WITH HOSPITAL PASS-THROUGH

4

### III. Guterman Left the Country, but Continues to Do Business Here

13. Shortly after the Complaint was filed and served in this case, and as unfavorable news reports began to surface, Guterman left for Israel. Guterman allegedly sought and received his Israeli citizenship. Guterman's counsel represented that he does not intend to return to the country before Passover in April, if at all. Guterman's counsel has also taken the position that Guterman will not appear in the United States for his deposition in this case before April, if he appears at all, even though he is a named Defendant and subject to the jurisdiction of the Court.

14. Guterman, however, remains a citizen of the United States, continues to conduct business in this country, and Aetna believes he owns property here as well. Guterman is still the CEO of PCH. PCH is still an active Delaware limited liability company, located in Chicago, Illinois. Guterman is also the CEO of a new Delaware company called MSMC Management, LLC ("MSMC"). MSMC was created in July 2019[7] in connection with Guterman's recent efforts to purchase a hospital in the Chicago-area.

### IV. Guterman Refuses to Provide Dates For His Deposition In The United States

15. On numerous occasions, Aetna requested that counsel for Guterman produce his client in this country for his deposition. Guterman has responded by refusing to agree to come to the United States for his deposition prior to April of 2020, and instead insisting that any deposition before that occur in Israel, although without offering any actual dates of availability.

---

BILLING SCHEME, *available at* https://www.justice.gov/opa/pr/substance-abuse-treatment-center-owner-pleads-guilty-57-million-money-laundering-conspiracy (announcing plea deal for money laundering relating to defendant's "arrangement with a laboratory owner to send urine samples for the facility's patients to the owner's lab for urine drug testing (UDT), in exchange for receiving 40 percent of the insurance reimbursements," which, in turn, was part of a separate arrangement "with the managers of [CGH]" and other hospitals aimed at billing insurers "through CGH" and other hospitals); *see United States of Am. v. Byrns*, No. 5:19-cr-06011-SJ-DGK, at D.E. 2 (W.D. Mo.), Criminal Information (alleging crimes against individual installed as CEO at Putnam Hospital in Missouri for, *inter alia*, healthcare fraud).

[7] "Entity Details" for MSMC Management, LLC *available at* https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx

## ARGUMENT

16. A party seeking to prevent his deposition from taking place bears the burden of demonstrating "good cause," and identifying a specific prejudice or harm. *Kimberly-Clark Corp. v. Cont'l Cas. Co.*, 2006 U.S. Dist. LEXIS 86469, *4-5 (N.D. Tex. Nov. 29, 2006); *Fram v. Memory Enters. LLC*, 2018 U.S. Dist. LEXIS 227279, *3-4 (C.D. Cal. Sept. 17. 2018). "Good cause" sufficient to prevent a deposition only exists when justice requires the protection of a party or person from any annoyance, embarrassment, oppression, or undue burden or expense." *Kimberly Clark*, 2006 U.S. Dist. LEXIS 86469, *4-5.

17. Guterman is a named Defendant, and he is the CEO of another primary Defendant, PCH. His deposition is critical, as he was the individual who brought the scheme at issue to Newman, after developing it and employing it at CGH.

18. The fact that Guterman, a United States citizen and officer of multiple U.S. companies, elected to leave the country *after* he was served and became subject to the jurisdiction of this Court does not alter this analysis, and the Court has the authority to order that Guterman appear here. For example, in *Custom Form Mfg., Inc. v. Omron Corp.*, 196 F.R.D. 333 (N.D. Ind. 2000), the court directed the corporate deponent to travel to the United States for deposition even though the deponents were foreign nationals. In so holding, the court stated that allowing depositions to proceed in a foreign country would compromise the court's authority and create judicial inefficiencies. "If a federal court compels discovery on foreign soil, foreign judicial sovereignty may be infringed, but when depositions of foreign nationals are taken on American or neutral soil, courts have concluded that comity concerns are not implicated." *Id.* at 336–37 (quotations omitted). The court also indicated its preference for a domestic location

would require fewer participants in the litigation to travel, so that it was more cost-effective to have the depositions in the U.S. *Id.* at 338.

19. Similarly, in *Natural-Immunogenics Corp. v. Newport Trial Group*, No. 15-02034, 2017 U.S. Dist. LEXIS 224140 (C.D. Cal. August 14, 2017), the district court compelled officers of corporate party to return to the U.S. from an extended personal oversees trip for depositions. The court gave several reasons. First, the court noted that the corporate officers left the country knowing they were going to be deposed, and failed to provide any notice of their trip. *Id.* at 16. The court also rejected the proposal for conducting the depositions by videoconference, noting logistical problems like the 12-hour time difference and the hindrance on examination using documents. *Id.* at *17–18. The court also explained that videoconference is inappropriate for deponents such as the corporate officers who are "key witnesses" and whose testimony will be "controversial." *Id.* at *18. Finally, the court reasoned that if the corporate officers could fund the expensive trip abroad, they could afford to return to the U.S. for their depositions. *Id.* at *19–20.

20. *SEC v. Banc de Binary* is also instructive. 2014 U.S. Dist. LEXIS 34373 (D. Nev. March 14, 2014). There, the Court directed a U.S. Citizen who owned and was employed by a Cypriot corporation to appear in the United States for his deposition; both the corporation and individual were defendants. *Id.* at *14. Amongst the factors[8] that it considered, the court placed weight on the fact that the defendants had reached into the forum where the deposition was noticed to engage in the wrongful acts of which they were accused. *Id.* at *22–23 (*citing Turner*

---

[8] Because *Banc de Binary* involved a foreign corporate defendant, much of the court's analysis, focusing on whether a foreign corporate defendant can be compelled to attend a deposition in the United States, is not necessary to the Court's decision here. However, given that the *Banc* court directed the deposition to proceed in Washington D.C., the court's rationale certainly counsels that, in this instance involving a U.S. corporate entity and U.S. citizen defendant, the deposition should likewise occur here.

7

*v. Prudential Ins. Co.*, 119 F.R.D. 381, (M.D. N.C. 1988) (reasoning, in part, that because the defendant traveled to the deposition's forum to solicit customers, the defendant should be deposed in that forum).[9]

21. With regard to the individual U.S. citizen defendant who resided overseas, the Court noted that his citizenship was a specific factor in its determination:

> Citizenship includes responsibilities. Among them is the responsibility to participate in the judicial process by serving on a jury. Although this duty is often excused when traveling abroad, it is well established that other responsibilities endure beyond the nation's border. The duty to pay taxes endures… The duty to obey criminal laws endures… And, if required the obligation to return home and testify at a deposition also endures. 28 U.S.C. § 1783; *Blackmer v. U.S.*, 284 U.S. 421, 438 [] (1932) ("The jurisdiction of the United States over its absent citizen… is a jurisdiction *in personam*, as he [or she] is personally bound to take notice of the laws that are applicable to him and to obey them").

*Id.* at *28.

22. After noting that there is generally a presumption that a *foreign* defendant be deposed at their principal place of business or near their residence, the *Banc de Binary* court found that the individual defendant before it, like Guterman, "is not a typical foreign defendant":

> He is an American citizen who, by virtue of his citizenship, retains certain responsibilities to the country while abroad. It would be fundamentally inequitable to allow [Defendant] to have enjoyed the benefits of his citizenship as he operated his business at home, and then excuse him of any associated responsibilities because he happens to live abroad.

*Id.* at *29.

23. Here, Guterman is not just a general corporate witness. He is a named Defendant, the CEO of another Defendant, and one of the architects of the scheme. It would not make

---

[9] Another factor considered by the court was the likelihood of discovery disputes that would require resolution by the forum court – in particular, relevant to both *Banc de Binary* and this matter, the deponent's invocation of his Fifth Amendment right against self-incrimination. 2014 U.S. Dist. LEXIS 34373 at *19-20. The Court reasoned this factor militated in favor of conducting the deposition in the United States, in light of the significance of the potential dispute and need for speedy resolution by the presiding judge. *Id.*

sense, nor would it be efficient or even safe, for lawyers to travel to Israel to take his deposition. *Cadent Ltd. v. 3M Unitek Corp.*, 232 F.R.D. 625, 630 (C.D. Cal. 2005) (noting "Israel may be a dangerous place to hold the depositions"). Aetna, PCH, the Labs, and the Fortis Defendants are all represented by different counsel, meaning that a large number of lawyers would need to travel to Israel, which is far more expensive and inefficient than having ***one named Defendant*** return to Chicago—where his active companies and counsel are located—for his deposition.

24. Guterman's counsel suggested that Aetna take his deposition by video link. A deposition by video is not feasible. Guterman is a primary witness, and Aetna wants to take Guterman's deposition in the room with him (as is Aetna's right). And, similar to the case in *Natural-Immunogenics Corp.*, there is a seven hour time zone difference between Israel and the United States. This time difference makes it impossible as a practical matter to depose Guterman via video. Aetna is entitled to depose Guterman for at least seven hours, which would require Aetna to begin the deposition either exceptionally early or exceptionally late in the day, and would render either party unable to obtain guidance from the Court in the event of a dispute.

25. Finally, Guterman's offer to depose him in person in April (at the close of discovery) is an empty gesture. For months, Guterman's counsel told Aetna he would not appear in the United States for his deposition. Last week, Aetna informed Guterman's counsel that Aetna would be filing this motion. Two days ago, Guterman's counsel told Aetna that Guterman would be here in April. This is not sufficient for two reasons. First, Guterman does not get to establish the date and time on which he is deposed. Discovery in this case ends in April, and he is far too important of a witness for Aetna wait until the end of discovery to depose him. Second, Aetna does not believe that Guterman has any intention of voluntarily sitting for a

deposition in this case, in this country or elsewhere.[10] He is trying to avoid being deposed for as long as possible, because he does not want to be placed under oath.

26.     Further, the fact that Guterman is electing to return in April favors Aetna's position. If he is actually retuning in April, he is signaling a willingness to enter the United States when he set fit. He can certainly return for his deposition, at his lawyers' offices. This is an important case, involving the theft of more than $21 million. Guterman's desire to remain oversees when it is advantageous for him, only to return on his own timeline, is evasive gamesmanship that should be rejected, and most certainly does not constitute the "good cause" Guterman must demonstrate to avoid attending his deposition as Aetna has attempted to notice it.

## CONCLUSION

For these reasons, Aetna respectfully requests that the Court grant its motion.

---

[10] Aetna's very real concern that Guterman would not appear for a deposition even if it were to occur in Israel is another reason to not permit Guterman to dictate the overseas location of his deposition, at considerable expense to Aetna and the other parties.

|  |  |
|---|---|
| | Respectfully submitted, |
| October 18, 2019 | */s/ David M. Prichard* <br> David M. Prichard <br> TX Bar No. 16317900) <br> **PRICHARD YOUNG LLP** <br> Union Square <br> 10101 Reunion Place, Suite 600, <br> San Antonio, TX 78216 <br> (210) 477-7400 <br><br> **ELLIOTT GREENLEAF, P.C.** <br> Union Meeting Corporate Center V <br> 925 Harvest Drive, Suite 300 <br> Blue Bell, PA 19422-1956 <br> (215) 977-1000 <br><br> **MCGUIREWOODS LLP** <br> JPMorgan Chase Tower <br> 600 Travis Street, Ste. 750 <br> Houston, TX 77002 <br> (832) 214-9942 <br><br> *Counsel for Plaintiffs Aetna Inc. and Aetna Life Insurance Company* |

## CERTIFICATE OF SERVICE

I, David M. Prichard, certify that the foregoing was served on all parties via the Court's electronic filing system.

/s/ *David M. Prichard*
David M. Prichard

## CERTIFICATE OF CONFERENCE

I, Gregory S. Voshell, certify that Plaintiffs' counsel has conferred with opposing counsel about this motion.

/s/ *Gregory S. Voshell*
Gregory S. Voshell